## D. G. HUMPHREYS *v.* J. L. WILSON.

1. ASSUMPSIT ON UNSTAMPED NOTE.—In an action of *assumpsit*, with one count on notes not stamped according to the United States revenue laws, and another upon an account for the original consideration of the notes, if the notes be held inadmissible as evidence, the plaintiff may recover for goods sold on account.

2. AGENCY—HOW CREATED, AND HOW PROVED.—An agent may be constituted by sealed writing, by "parol words," or by acts and implication; except that if the act to be done by the agent is to be under seal.

3. SAME—PROVINCE OF JURY TO DECIDE.—In a case turning upon the question of agency, and there is a conflict of testimony upon the fact, the jury must decide it

upon the weight of evidence. And it must be a very clear case in which the verdict of the jury will be set aside.

Error to the circuit court of Claiborne county. SMILEY, J.

*John B. Coleman,* for plaintiff in error, submitted an elaborate argument, tending to establish the following points:

1st. That the plaintiff below has no cause of action against any one for the salt, that transaction being utterly void. See Green v. Robinson, 5 How., 811; Glidenell v. Hite, ib., 110; Cowan v. Boyce, ib., 769; Brien v. Williamson, 7 How., 14; Thomas v. Phillips, 4 S. & M., 128; Wooten v. Miller, 7 S. & M., 380, and Bank of Newberry v. Stegall, 41 Miss. Rep., 143. That contracts made with an enemy in time of war are void. See 1 Kent's Com., 68; Story on Cont., § 213; 15 Johnson's Rep., 57; 7 Peters' Sup. C. Rep., 586.

2d. That if he has a claim upon any one for the price of the horse, it must be either against Willis or Daniel B. Humphreys, for he certainly has none upon defendant below.

3d. That upon the two promissory notes he has no cause of action against any one, unless it be Willis.

4th. That under no circumstances, is he entitled, either upon the account, or upon the promissory notes, to recover one cent. from D. G. Humphreys, the defendant below.

*J. H. & J. F. Maury,* for the defendant in error.

The jury very properly, from the evidence, rendered a verdict for $1,516 21—the full amount of Wilson's demand, with interest. But the legal tender question was still unsettled.

1st. The revenue laws of the United States have no application to the open account filed with the declaration, which was proven by other evidence than the notes.

2d. The agency of Willis, who purchased the salt and horse from Wilson, for D. George Humphreys, is abundantly established. He is proven to be a man of good character and standing. D. George Humphreys is estopped by his letters to Willis, the overseer, from denying his ownership of the plantation for which the supplies were furnished. In those letters he constantly speaks of the plantation as *his* property, and of the business, as *his* business, and to the

overseer, as *his* overseer, in the most ample terms, and makes no allusion whatever to his son Dan., but assumes such a control and ownership as would bind him as principal for whatever he does, whether by himself or through the instrumentality *res ipsa loquitur*. The letters speak the language of an owner throughout, and as they warranted Wilson in dealing with Willis, as his agent and overseer, so they warranted the jury in regarding him as the purchaser of the salt and the horse, and in rendering their verdict against him. As the judge of the circuit court, who witnessed the trial and heard all the evidence refused to set aside the verdict, this court will not be inclined to do so. Leflore v. Justin, 1 S. & M. R., 383 ; Dickson v. Parker, 3 How. R., 219 ; Waul v. Kirkman, 13 S. & M. R., 605.

3d. But if the plantation really belonged to Dan and not to D. George Humphreys, yet, the latter assumed and exercised such an apparent ownership as would entitle any one to consider him principal instead of agent, and to deal with him accordingly, either directly or indirectly, through his agent. Paley on Agency, 290–292, 293, 294; 15 East's R., 62; 4 Taunton, 574.

Wilson, who sold the salt, swears that he then thought that D. George Humphreys was the owner of the plantation, and that the salt and horse were sold on his credit. Paley on Agency, 296–298. It is true that D. G. Humphreys, as a witness, disclaimed the ownership of the plantation; but the jury, seeing, as well as hearing his evidence, and hearing the reading of his letters to Willis, preferred, as was their province, to believe the written evidence, and rendered their verdict accordingly; and now, using the language of the high court, " where the evidence is conflicting, it is a delicate matter for an appellate court to interfere with a verdict which has been permitted to stand by the court below." " The question is not whether the verdict is clearly right, but whether it is manifestly wrong." 13 S. & M. R., 605. If, in writing those letters, D. G. Humphreys was acting as the agent of his son, and in reference to his son's business, as

pretended by his counsel, it would puzzle even their ingenuity, to conceive a more proper case for holding an agent responsible for a purchase, whether effected by himself directly, or through the agency of another, a servant of his own. Paley on Agency, 392, 293, 294.

But it is contended that Wilson and Humphreys had no right to eat salt together. It is said that civil war was raging in the land; that the people of the United States were divided into two peoples, and organized into two governments, with two armies arrayed against each other in belligerent hostility, and that therefore, it was unlawful for Wilson and Humphreys to deal together in the article of salt. But after all, Wilson and Humphreys were not alien enemies, and there was no public common law nor act of either the Federal or Confederate congress that prohibited commerce between them. They were both citizens of Mississippi, and fellow-citizens of the Confederate States. We believe that commerce between the people of the Confederate States and the people of the United States may have been interdicted by act of the United States congress, and probably by the laws of war, but there was no law, written or unwritten, that prohibited the people of the Confederate States or of the State of Mississippi, from dealing among themselves. 3 Condensed U. S. Supreme Co. Reports, 574; 3 Condensed U. S. S. C. R, 246; same case, 8 Cranch R, 431.

The two letters of D. George Humphreys refer constantly to the Prairie Plantation as his property, and are addressed to Willis, as his overseer; and in express terms, give him ample authority to buy whatever he may deem necessary for the place. In short, he tells Willis to do as if he were acting for himself. One of the letters was dated in the fall of 1863, the other in the fall of 1864. The first letter gave express authority to the overseer for that year, and a continuing implied authority as long as Willis remained on the plantation as overseer. 2 Starkie, p. 33 and note; Paley on Agency, p. 137; Chitty on Bills, 8th ed., p. 35.

The continuing authority implied by letter of 1863, was

renewed and made express authority by the letter of 1864, which invested the overseer again with the most ample authority, to purchase supplies for the plantation without restriction as to the mode or means. Though Mr. Hum-·phreys, as a defendant, is fastidious on the subject of contraband trade, as a witness, he thinks the overseer might have paid for the salt with cotton (which could be sold only to the enemy), or with Georgia and Carolina money. His letter to Willis contain no allusion to either. Wilson being engaged only in lawful commerce with his fellow-citizens, had no use for cotton, which could be disposed of only to the enemy. He did take some of the Georgia and Carolina money, but on the express terms that it should not pay for the salt, unless Wilson could use it. He swears that he could not use it, and that the overseer took it back as was agreed.

6th. We think a note is no extinction of a debt due by open account. Chitty on Bills, 8th ed., p. 195. Authority is abundant to the point, that an open account is not extinguished by an instrument in the form of a note, but which is void for want of a proper stamp. Chitty on Bills, 8th ed., p. 144 and note; 40 Vermont, 179;·40 Illinois, p. 362;.ib., 457; McAfferty v. Hall, 24 Iowa R., shown in the American Law Review. We conclude that, if the notes are void for want of stamps, or for want of authority in Willis to make them, Humphreys is nevertheless bound to pay for the salt and horse, because they were bought on his credit, and by his authority.

The general terms of the authority to Willis, implied the exercise of such powers as in the usual course of business, were necessary and proper for the achievement of the object. Paley on Agency, p. 159–170; Chitty on Bills, 8th ed., p. 33. An agent employed to get a bill discounted, may endorse it with the name of his employer. Paley on Agency, 161–170; Chitty on Bills, 8th ed., p. 33; 4 T. R., 177.

The initials of D. George Humphreys' signature to the note were transposed so as to make it G. D. Humphreys, instead of D. G. Humphreys. See Conner v. Routh, 7 How. R.,

176; Kincannon v. Carroll, Governor, 9 Yerger; 11 Chit. on Bills, 8 ed., 178–207–579; Carpenter v. Snelling, 97 Mass. R., 452; Lynch v. Morse, ib., 458; Hunter v. Cobb, 1 Bush. Ky. R., 239; Sayle v. Davis, 22 Wis. R., 225.

At the date of the notes, and in view of all the circumstances of the case, it is very improbable that either of the parties knew or thought of the revenue laws of the United States, or had any intention to evade them. Yet, it is sufficiently established that to invalidate a contract for the want of a stamp, it must be shown to have been omitted with intent to evade the provisions of the stamp act. Acts of Congress 1866, p. 142; Hitchcock v. Sawyer, 39 Vt. R., 412; Halyoke Machine Co. v. Franklin Paper Co., 97 Mass. R., 150; Vorbeck v. Roe, 5 Barb., 320; Blunt v. Bates, 40 Ala. R., 470–475; Dudley v. Wells, 55 Maine R., 145.

SIMRALL, J.:

This cause is brought here by writ of error, to revise a judgment of the circuit court of Claiborne county.

The defendant in error, Wilson, sued Humphreys, plaintiff in error, in *assumpsit*, founded on two promissory notes, and an open account. Humphreys pleaded *non assumpsit*, and *non est factum*, as to the promissory notes. The jury rendered a verdict for the plaintiff. A motion for a new trial was overruled, and a bill of exception sealed, embodying all the evidence.

Several questions were made in the circuit court, and are repeated here in the assignment of errors. But the essential inquiry for our investigation, into which all others are merged, is, shall the verdict of the jury be sustained. The more important facts are, that one A. Willis, was overseer on the Prairie Plantation, in Washington county. That this plantation originally belonged to D. G. Humphreys, who resided in Claiborne county; that in 1861 the property was given by deed of conveyance to Daniel B. Humphreys, his son, who went, on the outbreak of the war, into the Confederate military service, leaving in the hands of the said Willis, sundry

bank notes of Alabama, Georgia and North Carolina banks, for the purpose of buying necessary plantation supplies; that he was on the place in October, 1864, and instructed said Willis to use said funds to buy salt or other necessaries, and also a horse for cavalry service.

The defendant, D. G. Humphreys, testified that on the breaking out of the war, Henderson, the former overseer (as he understood) recommended, or left on the place, said A. Willis, as overseer, acting for his son Daniel; that witness never knew him or employed him; never gave him any authority to make contracts for him, or bind him in any way; that the only communication he ever had with Willis, by letter or otherwise, was on the business of his son, Daniel, whose agent he was, during his absence in the army; that his letters to said Willis had reference to his son's business; that by those letters he did not intend to give authority to run the place in debt, believing it was provided with cotton and money to buy salt, or whatever was needed, and with no intention to give authority to said Willis to bind witness, or sign his name to notes; that witness long before 1864, and since, has resided in Claiborne county.

Two letters from the defendant, D. G. Humphreys, to Willis, were read on the trial; one dated August, 1863, among other things, contains as follows: "I do not know what advice to give you about my property in that county. I can only say I want you to act for the best interest of the place. I can't furnish you any supplies of any sort. If you have any safe, good chance of sending for salt, I would do so. I want you to act in all cases as you would for yourself. This is all I can say about my business up there. Do the best you can and I will be content."

The other is dated October 26th, 1864. Among other things the writer says: "*I received your letter*, and notice what you say. I have no salt to send you. *Mr. Wood says you* have the promise of some, and you will have to try and get as much as will do you.     *     *     *     I cannot give any

directions, as I do not know what kind to give, and you must do as you think best."

The notes sued on were signed, G. D. Humphreys, by A. Willis, agent. Plaintiff testified that he sold the salt and horse mentioned in the bill of particulars to the defandant, through Willis, his agent. The first salt was sold on the 23d of September, 1864, and the other lot afterwards. The horse he had seen plowing on Prairie Plantation. The small note was given for the first lot of salt, for which plaintiff accepted bank notes, on condition that they were to be returned, if witness could not use them. They could not be used, but were returned when the note was executed. That at the time of these sales the defendant was in Claiborne county; never saw him about this time in Bolivar. He considered the defendant as the principal. Prairie Plantation was several miles from where the witness lived. At the time of sales did not know, nor had he heard, that the Prairie belonged to Daniel B. Humphreys, but had heard it since; before that, was under the impression the plantation belonged to the defendant. Saw the defendant, for the first time, some time after the surrender, and asked him for payment. Defendant referred him to his son. Sillers, who owned the plantation adjoining Prairie place, did not know about the title to the property; but that it was worked by D. B. Humphreys since 1860. At the request of the defendant, the court instructed the jury to the effect, that before the plaintiff can recover he must prove that the defendant, Humphreys, authorized Willis to make the contract and bind him; and if the jury believe that D. G. Humphreys never did authorize Willis to make the contract, or to incur any debt, to be binding on him, then, although they may believe the salt was bought, defendant is not bound to pay for it.

The promissory notes were not stamped until shortly before the trial, when plaintiff put stamps upon them. For this cause objection was made to their being read in evidence. There was also a count in the declaration, on the original consideration, for which the notes were given, and a bill of

particulars filed. It is not necessary to the decision of this case, to pass on the admissibility of the notes in evidence, for if the notes were invalid, and no evidence of a contract, then the plaintiff could go back to the consideration of the notes and recover for goods sold and delivered. Chit. on Bills, p. 144, and note; Jacob v. Lindsay, 1 East, 460; King v. Inhabitants of Pendleton, 15 East; 8 Barn. & Cress, 14; Greenl. Ev., § 436.

The primary and essential fact in the case is the authority of Willis, who professed to act as the agent of the plaintiff in error in making the purchases, and giving the notes. If it could be held that Willis had authority to make the purchases, but could not give the notes of his principal, that would settle the plea of *non est factum* in favor of the plaintiff in error, but would leave him liable on the count of *indebitatus assumpsit* for the goods sold and delivered. An agent may be constituted by a sealed writing, by parol words, or by acts and implications. Story on Agency, § 46, p. 42. The exception is, that if the act to be done by the agent requires a seal, the instrument appointing him must also be sealed. The common law does not require that the authority to an agent to sign a written contract, should also be a writing. An agent may, by a verbal authority, or by a mere implied authority, sign or endorse promissory notes for another. Story on Agency, § 50, p. 46; Ransom v. Curtis, 19 Illinois, 456.

The investigation before the jury, of the authority of Willis to bind the plaintiff in error in these contracts, was very thorough. The plaintiff in error, and defendant, and Humphreys, the son, testified, as did several others. The court charged the jury that the burden of proof was on the plaintiff to make out the agency, and if it had not been done, they must find for defendant. A stranger reading the letters of the defendant, Humphreys, in view of the fact that he was living two hundred miles from the Prarie Plantation, with regular communication cut off by the river, access by land precarious and uncertain on account of military operations, as shown by the testimony, and the conclusion would

be irresistible that Willis could be contracted with as agent, for salt and other necessaries, and that the defendant stood in that behalf, in relation to him, as a principal. At all events, there was testimony tending to prove this. It was the province of the jury to weigh, consider, and estimate the testimony. The very intelligent circuit judge refused to disturb the verdict. What, then, is our duty? In the case of Leflore v. Justin, 1 S. & M., 383, the court said, " it must be a very clear case in which this court will set aside the finding of the jury." In Waul v. Kirkman, 13 S. & M., 605, the chief justice, for the court, said : " When the evidence is conflicting or doubtful, it is a delicate matter for the appellate court to interfere with the verdict. There should, at least, be a great preponderance of evidence against the verdict. The question is not whether the verdict is right, but is the verdict manifestly wrong." In Dickson v. Parker, 3 How., 222, the court remarked : " The whole case was before the jury, and although it would appear from the bill of exceptions, that the preponderance of proof was in favor of the plaintiff, yet we cannot, for that reason alone, award a new trial. It is not our business to weigh the testimony. It is sufficient that we see proof that legally conduced to the verdict."

In this case, the verdict was not induced in anywise by the misdirection of the jury by the court. On the contrary, the instruction given, plainly laid down the principle of law applicable to the testimony. To set aside this verdict and award a *venire facias*, would be to substitute the opinion of this court on the testimony, in place of the verdict of the jury. The utmost we can do is to reverse a verdict found without testimony, or manifestly against the great preponderance of testimony.    *Judgment Affirmed.*